# SUPREME COURT OF TEXAS.

## AUSTIN TERM, 1864.

---

### Ex Parte Abraham Mayer.

There are two limitations imposed on the legislative power : the first arises from the power of construction, and is vested in the courts and applied to written law of all kinds, when the laws are ambiguous or contradictory; the second is, the restrictions imposed by the constitution, and which the judiciary must enforce.

If the legislative power is restricted, it must be exercised in subordination to the restriction; if it is without qualification of any kind, the power of legislation is co-extensive with the grant.

The power to raise armies is conferred in express terms by the constitution of the Confederate States; but who shall compose the army, or how it shall be raised, or what number shall constitute it, must, to a great extent, be left to the wisdom and discretion of congress.

The object of such a grant was to confer a real and substantial power, and its exercise is not to be restrained by any rules which are merely technical, and which are applicable as such to questions affecting rights of property, or contracts relating to property, or arising by implication from legislative action : the grant must receive such interpretation as will accomplish the object intended by the framers of the constitution, so far as it can be ascertained.

The power to raise armies must not be so construed as that its use, if exercised, might result in the destruction of the State governments; or, that would impair any right over which congress has no power to legislate; or, that would render the Confederate States unable to give that protection to the States to which they are entitled, and may demand under the guarantees of the constitution.

The presumption is not to be indulged, that congress has transcended or perverted its authority, in enacting a law under the power conferred to raise armies; it must be a clear case of the violation of the constitution, that will warrant the interference of the courts.

The contracts designed to be protected by the constitution are, 1st, contracts by which private rights of property are vested ; 2d, in the term contract is not included rights growing out of regulations of the government relating to public policy, or to statutes giving privileges or granting exemptions ; these rights are in the nature of legislation, and not of compact, and are dependent on the discretion of the legislature.

There is nothing in the constitution of the Confederate States which prohibits congress from violating the obligation of contracts, though such a right is denied to the States.

The repeal of the law allowing substitutes, and making the principal liable to military duty, is not a violation of the constitution of the Confederate States.

Congress has no power to pass *ex post facto* laws, but the courts have uniformly construed this power to relate to criminal legislation only.

The government, under the exemption laws, is not a party to the contract between the principal and his substitute; nor can it be implied from the language of the statute, that such contracts were contemplated by the law-makers, or that the government would incur any liability beyond the obligation to pay the substitute what was paid to any other soldier for like services.

As long as the law of exemption by substitution remained in force, the rights it conferred were to be held and enjoyed, subject to the future action of congress ; and it is not to be supposed that the government intended to part with the right to control the subject in future.

Though there may be a moral obligation to provide for cases of hardship, yet the courts have ever *held*, that a moral obligation, only, is not a ground for its enforcement as a legal right.

APPEAL from Nacogdoches. Tried below before the Hon. Richard S. Walker sitting in chambers.

Applicant, previous to the 4th day of June, 1863, was enlisted as a soldier in the army of the Confederate States, for the term of three years. On that day, he offered a substitute, who was fifty years of age, and, on examination, being found capable, was received and applicant discharged. On the 3d day of March, 1864, applicant was enrolled by the enrolling officer for Panola county, and ordered to report to the commandant of a camp of instruction. On the 12th of March, applicant sued out a writ of *habeas corpus*, and prayed for a discharge on the ground that he had furnished a substitute.

The enrolling officer, in his return to the writ, stated that he held the appellant in custody as a conscript, by virtue of the act

of the congress of the Confederate States of January 5th, 1864, entitled "An act to put an end to exemptions from military service of those who have heretofore furnished substitutes."

The judge dismissed the writ, and remanded the appellant to the custody of the enrolling officer.

*Donley & Anderson* and *W. R. Poag*, for the appellant.

REEVES, J.—The question in this case is, whether congress had power to revoke the exemption granted by the law of April 6, 1862, and require all who had furnished substitutes to perform military duty. The 9th section of this law declares "that persons not liable for duty may be received for those who are, under such regulations as may be prescribed by the secretary of war." By an act passed on the 5th January, 1864, "no person shall be exempted from military service by reason of his having furnished a substitute;" and the subsequent act of Feb'y 17, 1864, repeals all laws granting exemptions from military service.

To decide this question, it is necessary to have correct views of the division of power in our political system, and to ascertain, as far as practicable, the boundaries of the legislative and judicial functions.

In forming the government of the Confederate States, certain powers, enumerated in the constitution, have been granted, and all others are reserved to the States or to the people. In forming the government for a State, the whole of this reserved power, except what is reserved in the constitution, is conferred on the legislative, executive and judicial branches of the government. The relative position of these governments to each other does not depend on the order of time in which their constitutions were made, as each were formed with reference to the other.

The division of the powers of government into these distinct departments has been, at all time, a leading idea, and is not peculiar to any one State, but is found to exist in all State constitutions, and in that of the United States and of the Confederate States.

While this is distinctly declared in all the constitutions, the

extent and nature of these powers are not very clearly defined, but must be sought for in a just consideration of the powers conferred on each distinct branch of the government. On the legislative power two limitations are imposed. The first arises from the power of construction, and is vested•in the courts and applied to written law of all kinds, when the law is ambiguous or contradictory; and secondly the restrictions imposed by the constitution, and which the judiciary must enforce. If the power is restricted, it must be exercised in subordination to the restriction. If it is without qualification of any kind, then the power of legislation is co-extensive with the grant.

Congress has power " to declare war;" " to make rules concerning captures on land and on water;" "to raise and support armies;" "to make rules for the government and regulation of the land and naval forces;" " to provide and maintain a navy;" "to provide for calling forth the militia," &c.; "to provide for the common defence;" "to make all laws which shall be necessary and proper for carrying into execution the foregoing powers."

The power to raise armies is conferred in express terms; but who shall compose the army, or how it shall be raised, or what number shall constitute it, must, to a great extent, be left to the wisdom and discretion of congress.

The object was, no doubt, to confer a real and substantial power, and its exercise is not to be restrained by any rules which are merely technical, and which are applicable as such to questions affecting rights of property or contracts relating to property, or arising by implication from legislative action; but the clause must receive such interpretation as will accomplish the object intended by the framers of the constitution, so far as it can be ascertained. The obligation of the Confederate States to protect the States against invasion and domestic violence, most obviously refers to the power to raise armies, as these objects could not be otherwise secured. But the power to raise armies must not be so construed as that its use, if exercised, might result in the destruction of the State governments, or that would impair any right over which congress has no power to legislate, or that would render the Confederate States unable to give that protection to the States to which they

are entitled, and may demand, under the guarantees of the constitution. That would be to pervert the power which was intended for the protection and common defence of all the States into an engine of self-destruction; and its work would be accomplished with as much certainty as though the territory of a State should be invaded by physical force, under authority of the Confederate States.

When the power of the judiciary is invoked to arrest the execution of a law, for the reason that it conflicts with the constitution, the courts must judge and decide for themselves; and their decision, if against the validity of the law, does not proceed so much on the ground that the law-makers have transcended their authority, though that result may necessarily follow, as that the courts, in exercising the authority vested in the judiciary as a separate branch of the government, withhold their assent from the law, and thereby arrest and defeat its execution.

The power to raise armies has been exercised on grounds supposed to be proper by the party who is to judge of its propriety and necessity, and the presumption is not to be indulged that the power has been perverted, or that its exercise will be abused in a way to defeat rights secured by the constitution or reserved to the States; or, in other words, it must be a clear case of violation that will warrant the interference of the courts.

But it is urged for the complainant, that the act of April 16th, 1862, allowing substitutes, is in the nature of a contract; and that, as he had complied with its conditions by furnishing a substitute, the repeal of the statute by the act of January 5th, 1864, impaired the obligation of the contract, and was a violation of the constitution of the Confederate States, and therefore a nullity.

If it were true that there was a contract, and that it was impaired by requiring the appellant and others who had furnished substitutes, to perform military duty, and by the repeal of the law under which they enjoyed the exemption, still, there is nothing in the constitution which prohibits Congress from violating the obligation of contracts, though such a right is denied to the States. (Evans v. Eaton, Peters' C. C. R., 337.)   Congress has no power

to pass *ex post facto* laws, but the courts have uniformly construed this power to relate to criminal legislation only.

While it is admitted that the constitution does not, in express terms, prohibit congress from passing a law violating the obligation of contracts, it is contended that as the government of the Confederate States is the creature of the States, and that as the latter can not exercise that power, neither can the former; or, that the exercise of such a power being denied to the States, it must be held to apply to the Confederate States. To this it may be replied, that the government of the Confederate States, like the government of a State, is derived from the same source—the people, and is founded on their authority; that the constitution and laws of the Confederate States are the supreme law of the land, and not in any sense dependent on the constitution of a State for their authority; and that we must look to the instrument which confers the power to ascertain whether a law of congress, in a given case, is constitutional or not. It is not, however, intended to rest the decision of the case before the court on the doctrine that congress can violate the obligation of a contract, but proceed to examine the question under the influence of the restriction as it relates to a State. The contracts to which the constitution refers can not be violated by the laws of a State, and the cases cited in the brief of the appellant's counsel arose under the statutes of the State legislature, which were held to be in the nature of contracts.

This leads us to enquire what contracts are protected by the constitution, and what acts of the legislature impair their obligation. It has been held that contracts executory as well as executed are protected by the constitution; and that wherever absolute rights to property had vested, the repeal of the statute impaired the obligation of the contract, and was therefore unconstitutional—not because congress did not have power to pass such a law, but for the reason that the constitution denied to the States the exercise of that power, as decided in the case of Fletcher v. Peck, (6 Cranch, 136,) involving the constitutionality of certain grants of land by the legislature of Georgia, known as the Yazoo grants.

This same principle was asserted in the Dartmouth College case, (4 Wheat., 519,) and sustained by the court.

These cases decide that all private rights of property created by a statute are protected by the Constitution, and this doctrine has been ever since considered as settled. In the case of Butler and others v. the State of Pennsylvania, (10 Howard's R., 416,) the plaintiffs had been appointed by the governor canal commissioners under the act of January, 1836—the statute directed the appointment to be made on the 1st day of February, annually. The compensation of the commissioners was fixed at four dollars per day, each. They were appointed on the 1st day of February, 1843. By a subsequent statute of the 18th April, 1843, the appointment of the commissioners was transferred from the governor to the people, and the per diem allowance reduced from four to three dollars, the reduction to take effect from the passage of the act. The commissioners claimed the right to retain pay for their services at the rate of four dollars per day for the term of twelve months from the date of appointment. The Auditor General of the State refused to allow that rate of compensation beyond the 18th April, 1843, the period fixed by the new law for the change of the emoluments of the office. It will be noticed that the commissioners claimed the full allowance during the entire year, on the ground that the State could not pass a law impairing the obligation of a contract. In deciding the case, the Supreme Court say, "that the contracts designed to be protected by the 10th section of the 1st article of the Constitution, (the section against impairing the obligation of a contract, of which ours is a copy,) are contracts by which perfect rights, certain, definite, fixed private rights of property, are vested, as distinguished from rights growing out of measures or engagements, adopted or undertaken by the State government for the benefit of all, and from the necessity of the case, and according to universal understanding, to be varied or discontinued as the public good shall require." The court further held, "that there was no contract between the State and the Commissioners within the meaning of the Constitution of the United States." This case was first decided in the Court of Common Pleas, and then in the Supreme Court of the State, and finally by

46*

the Supreme Court of the United States. (1 Kent., 463; 10 Howard's R., 402; 4 Barr's R, 51; 6 Serg. & Rawle, 322.)

The principle asserted in these cases was fully examined by the Supreme Court of Massachusetts in the case of the Commonwealth v. Bird, (12 Mass. R., 443.) Bird was commissioned in June, 1797, as a lieutenant in a company of cavalry in the militia of Massachusetts, and in June, 1799, was honorably discharged, and the question was, whether this entitled him to exemption from militia duty. By the act of 1793, all persons who had held the office of a subaltern or office of higher rank, under the government of the United States, or that of either of them, was exempted from militia duty. The statute continued in force until March, 1800, and was then repealed. The repealing statute provided for the exemption of all who had held a commission in the army or militia, and who were then out of office. Under this statute, Bird continued exempted. On the 6th March, 1810, the statute was repealed, and a new statute was made on which the case depended. By this statute there were two cases of exempts; the first were exempted absolutely from all militia duty, and the second from all duty except that of keeping themselves furnished with arms and equipments, and sending them to be inspected at the annual inspection, upon condition that they paid $2 annually to the treasurer of the town where they resided. In deciding the case, the court say : the case has been supposed of an exemption actually purchased by a kind of contract with the government, as if in the last statute, instead of requiring the payment of $2 annually, it had been enacted that any of the persons there described should be perpetually exempted upon paying at once the sum of $100. "The only question therefore, is, whether the legislature had power, under these circumstances, to revoke the exemption formerly enjoyed by Bird, and require him to do duty among the conditional exempts. We are not prepared to say that one set of legislators can control their successors to this extent in a case of such vital importance to the commonwealth. There may undoubtedly be cases in which it might be deemed a breach of the public faith to revoke such exemption, and it is not to be supposed that the legislature would do it in any case without very powerful motives. But we are not

authorized to weigh those motives, or to suffer them to have any influence on our decision, when the law is clearly and unequivocally expressed. We cannot allow, in this case, the exemption claimed by the respondent without deciding that the legislature cannot under any circumstances require the services of an individual who has once been exempted. We must say, that an able bodied citizen, whose services in the militia have been dispensed with, or commuted in time of peace and tranquillity, can never afterwards be compelled to lend his aid to the government, although the existence of the government may be threatened by the most formidable or domestic enemy. We can see no principle on which the exemption in this case could be allowed, that would not also involve a case like that here supposed. This would be carrying those exemptions to an extent that never could have been contemplated either by the legislature who granted, or by the citizen who performed the conditions prescribed by law."

We are then to deduce as correct conclusions from these cases, that the contracts designed to be protected by the Constitution, are, 1st, contracts by which private rights of property are vested; 2d, in the term contract is not included rights growing out of regulations of the government relating to public policy, or to statutes giving privileges or granting exemptions; and 3d, that these rights are in the nature of legislation, and not of compact, and dependent on the discretion of the legislature.

Again, it is contended, that if the government can in the exercise of any of its powers, require the complainant, after he has furnished a substitute, to render military service, that it can only be done after refunding the sum he has paid to his substitute; and no provision of the kind having been made, the act of January, 1864, is unconstitutional. This position is attempted to be sustained by bringing the case before us under the operation of the 4th section of the 1st article of the Constitution, which declares that private property shall not be taken for public use, without making just compensation. The train of reasoning on this proposition does not differ from that already noticed on the subject of contracts. But it will be found to be very difficult, if not impracticable, to control the exercise of one of the powers of Congress by

restrictions imposed on another power designed for another object. The power to raise armies looks to the common defence and protection of persons and property against foreign or domestic foes. The right to take private property for public use is founded on the idea that private rights must yield to public necessity. Each is the exercise of sovereign power—one relating to persons, and the other to property. The right of eminent domain as applied to property, is the same right, by whatever name it may be called, applied to persons when the exigencies of the country demand its exercise and require the services of persons for the common defence. The principle is admitted by all writers, and is found to exist in all systems of government. The sovereign power, wherever it may be lodged, must judge of the exigencies that will justify the exercise of the power, and in our system of government that power has been conferred on Congress. But if it could be shown on the principle contended for that the government could not require the appellant to perform military duty without compensation, it by no means follows that the government would be forced to refund the amount paid to the substitute. If property had been taken for public use, it would not be contended that the government must pay what it had cost the owner ; a just compensation, or the value of the property without regard to the original cost, would be the measure of redress. Nor can it be said that the government was a party to the contract the appellant may have made with his substitute, nor is it to be implied from the language of the statute, that such contracts were in the contemplation of the law makers, or that the government would incur any liability beyond the obligation to pay the substitute what was paid to any other soldier for like services. If the principle could be invoked at all, or if it could be implied that the government could not take the services of a citizen to aid in the defence of the country when the government is threatened with destruction, though he may have been previously discharged—if the government cannot do this without making compensation, then it may be said that the government has not exercised the power without the restriction, but has fixed the amount and regulated its payment to the soldier. But the right to take private property for public use, on making compensation, has

no reference to a case like the one before us; it concerns property and nothing else.

As long as the law of exemption remained in force, the rights it conferred were to be held and enjoyed subject to the future action of Congress, and it is not to be supposed that the government intended to part with the right to control the subject in the future. That such was not the intention, is apparent from the whole course of legislation before and since the repeal of the statute allowing substitutes to be received. And hence it will be found that the policy of calling additional forces into the service, according to the exigencies of the country, has been steadily adhered to.

That there may be a moral obligation to provide for cases of hardship, can have no influence on this decision, as the courts have ever held that a moral obligation only is not a ground for its enforcement as a legal right.

The opinion here pronounced, is decisive of, and intended to apply to the following cases: No. 2943, Barkley v. Thomason; No. 2944, Newton v. Thomason; No. 2945, Craig v. Thomason; No. 2946, Darden v. Thomason; No. 2947, Jeter v. Thomason; No. 2948, Moore v. Thomason; No. 2949, Pope v. Thomason; No. 2950, Evans v. Thomason; No 2951, Lusk v. Thomason; No. 2952, Chinske v. Thomason; No. 2953, Sherman v. McMillan; No. 2955, Rogers v. Welden, all from Leon county.

Judgment affirmed.